For the first case we have, let me call it, it's 19-7052 United States v. Cushing and Hall, and we've consolidated the argument. So we have Mr. Lund, Ms. Miller for the appellants, and then for the appellees is going to be Ms. Epperle. And so the plan was to go 15 and 15 and then 30. And so let's go with that and see how it works and if we need to recalibrate we can do so. So let's call up Mr. Lund. You can go first. You may proceed when you're ready. Your sound's off, Mr. Lund. Turn on your mic. Mr. Lund, we can't hear you. Yes, okay. There we go. I'm sorry. Mr. Lund, we're having some technical quality problems with your presentation. Both the video and the audio are poor. Is that true for the other judges? I can see him, but I can't hear him. Mr. Lund, we can't hear you and your image is frozen. No, we can't hear you. Ms. Lindstrom, maybe I can switch over to Ms. Miller and then why don't you see if we can reboot Lund while she's making her presentation. Is that okay? Did you hear that, Mr. Lund? Why don't you sign off and rejoin us? And Karen, did you catch that? Yep, I got that, Judge. We'll switch over to the next one. All right, thank you. Okay, let's get started then with Ms. Miller. You may proceed. May it please the court, good morning. I'm Andrea Miller and I represent Chris Hall. I never knew Chris to be a drug dealer. That was the testimony of Waylon Williams, the central figure in the overarching conspiracy in this case, and it was uncontroverted when he testified to it. The one time Mr. Hall's friend, Julie Guffey, tried to buy meth from him, he said, no, I'm not a drug dealer. Even the government's case agent, John Morrison, testified that Mr. Hall was in an ongoing customer-distributor relationship. Despite that testimony, the government wants to convince the court that there was sufficient evidence to show that Mr. Hall had engaged in the larger conspiracy alleged in this case for three reasons. Number one, because he had an ongoing buyer-seller relationship with Mr. Williams. There's no question that he was buying quantities of methamphetamine on a regular basis from him for personal use. Number two, that he had distributed a quantity to his friend Julie Guffey and Megan Watkins on one occasion when they were at his house basically passing the pipe in a social manner. And number three, that he acted as the enforcer, meaning that he provided information to Mr. Williams in an attempt to try to protect the overarching conspiracy. Ms. Miller, can I ask you, and I think you have accurately captured the government's argument, but on sufficiency of the evidence, we do have to review the entirety of the record. And Agent Morrison, at page 82 of the transcript, testified that an eight ball, three and a half grams of methamphetamine is a distributor quantity. And Mr. Hall was purchasing 14 grams twice a month. So can't we, viewing the evidence favorably to the government, reasonably infer that 14 gram purchases would have been for distribution given Agent Morrison's testimony? Your Honor, I have, there's two parts to my answer to that question. The first is that Waylon Williams himself testified, who was the one providing the drugs to Mr. Hall almost exclusively, that the quantities that Mr. Hall was purchasing from him wasn't very much, and that he believed that Mr. Hall was using those quantities. And even Agent Morrison, and I believe possibly Agent Epps, testified and acknowledged that methamphetamine users generally increase their personal usage over time, which is very common with a meth addiction like Mr. Hall had. Counsel, isn't that a question and a fact that the jury could have disbelieved and believed the other? And isn't that at least sufficient evidence as to the point that Judge Bacharach's making? Your Honor, it is a question of fact, but it's, that we submit that it wasn't a rational decision for the jury to take the word of a case agent or a government expert over the word of the central figure in this distribution. You do acknowledge, though, that that's evidence that's against you. Your Honor, I agree that yes, absolutely, it's evidence that's against us, but weighing it, I don't think that the testimony, that the generalized testimony offered by the government witnesses can overcome the testimony of the actual person who was providing the methamphetamine to Mr. Hall. That it's, it's not, while, while it might be a choice for a jury to make, it's not a rational choice because the testimony came from the one person, and this, that kind of separates this case from other cases and this court has often seen where, where it requires a lot of circumstantial evidence to establish whether somebody in Mr. Hall's position was, went beyond a buyer-seller category. Here you have the central figure of the government, of not only the conspiracy scheme, but the government's case. The entire case was built around him, and in order to say the testimony that that amount of methamphetamine that Mr. Hall was purchasing from Mr. Williams was not a user amount and was instead a, a seller amount, you would be disregarding the person who was actually involved in those, that distribution, and he... Sure, can I ask you a separate question? Is, assuming that you are correct, what about the testimony that, that Mr. Hall reported to Mr. Williams that that B word, Jessica, was ratting, was opening her mouth about that deal in Arkansas, the incident involving the arrest of Megan Watkins? Could a reasonably, a jury viewing the favorably to the government, reasonably infer from that testimony that Mr. Hall was acting by virtue of counterintelligence to report the, the threat posed by Jessica in Arkansas? No, Your Honor, not if you look at that phone call as a whole, because in fact, if you review the phone call very carefully, it's actually Mr. Williams who starts the conversation talking about somebody in Arkansas having a conversation and bringing up their names. So Mr. Williams, just like other telephone calls that occurred where the government alleges that Mr. Hall was providing counterintelligence for Mr. Williams, it was Mr. Williams who started that conversation. Mr. Hall weighed in, but it was only after Mr. Williams provided him that information and not vice versa. And you see a pattern of Mr. Williams talking in the, in the exhibits of the telephone calls that were admitted, you see a pattern of Mr. Williams telling Mr. Hall what he knows about what's going on. There is a, the one text where Mr. Hall says the roads are too hot, but, but I don't think that that in and of itself is enough to establish that Mr. Hall was anything more than a buyer of methamphetamine from Mr. Williams and was trying to protect himself. What about the other phone call where they discussed, he discussed a snitch and he assaulted a woman who he, who he had accused of talking to the police? Yes, Your Honor. And that's, and that phone call is critically important to our argument in relation to our first proposition, challenging sufficiency of the evidence. But we also challenged the very admission of that testimony, of that evidence in our second proposition, challenging it as neither res gesti nor proper 404B evidence. That telephone call taken in isolation doesn't even really make any sense, but it certainly doesn't show that Mr. Hall was acting as an enforcer for Mr. Williams. And there's a couple of reasons why. When you look at the language that she used in that phone call, he doesn't say she snitched us out. He says she snitched me out. It has nothing to do with the greater conspiracy. Waylon Williams testified that it had nothing to do with drugs whatsoever. He's not really sure what it had to do with. There was no response by Mr. Williams in, uh, to that phone call. He didn't ever go find Mr. Hall that night, find out what was going on. As far as we know, the police were never even called. So it appears that that phone call on Mr. Hall's end was out of excitement and paranoia that something had happened that, um, did not actually draw any police response. And so the phone call itself doesn't make a lot of sense. We don't know what happened because the government never bothered to go find out what happened. They never bothered to contact Haley, even figure out who Haley is, let alone interview her. And Mr. Hall was never arrested for domestic violence. So we don't really know what that telephone call is about. And for that reason, and the fact that Waylon Williams once again testified that that had nothing to do with drug distribution does not help the government's case as it relates to whether or not Mr. Hall was acting as an enforcer to protect the greater conspiracy. And again, you would have to ignore Williams' own testimony about that situation and the fact that no other information beyond, um, innuendo was offered relating to that phone call to connect it in any way to the drug distribution scheme. He also bought a pistol for Mr. Hall. Would that suggest to a juror some kind of enforcement relationship? On its face, your honor, I don't believe it does because that would not be an uncommon exchange amongst friends, particularly in the area of the state of Oklahoma that that, that, that gun transaction occurred in. And so, um, no, it in of itself. And it's my understanding based on the exhibits that it was actually Williams who was purchasing the firearm from Mr. Hall. Again, not vice versa. And so while, um, it might reflect that Mr. Williams had concerns about his own, um, drug distribution scheme, it certainly doesn't show any act on behalf, on the part of Mr. Hall that could possibly increase his participation in this beyond a mere, um, buyer-seller relationship. The purpose of Megan Watkins, uh, walking away with a half gram, uh, doesn't, uh, uh, from Hall's, uh, residence, doesn't, doesn't that at least suggest that he was distributing some amount of methamphetamine to Megan Watkins? Your honor, we have no idea what the circumstances around Megan Watkins testimony that she left his house on one occasion with methamphetamine. For all we know, she could have stolen the methamphetamine. So, so on its face, it does not. Additionally, it, it, uh, this court in the buyer-seller context has repeatedly said that the buyer-seller rule is designed to separate, um, end users from mid, low-level, mid-level, or higher-level drug distributors who are basically distributing drugs for profit or for other benefits. And Mr. Hall passing the pipe to the two women at his house certainly doesn't, under this court's case law, constitute distribution. And the information that Megan Watkins testified to for the first time at trial, um, nobody ever had ever heard that testimony ahead of that, um, at least there was no notice of it, um, certainly does not suggest that he in any way had any kind of benefit, um, or, um, received anything in exchange for the methamphetamine that she took. So I do not think that that testimony is enough, um, and it's certainly not in any kind of, um, manner reliable enough for this court to rest a decision that, that Chris Hall was more than an end user as opposed to in the actual distribution scheme and part of the greater, um, conspiracy. And, uh, if, uh, if the court will allow me, I'd like to reserve the Mr. Lunn. Are you with us now? Mr. Lunn, you're on mute. It's okay. I'm gotten off. Hi, can you hear me now? You may proceed. Thank you. Um, may it please the court, uh, this case involves three important evidentiary issues and whether they had a substantial influence on the which obviously prohibits the introduction of other crimes, wrongs, or acts to prove the character of a person to show he acted in conformity therewith. In other words, to show whether he had the propensity to commit the crime charge. This court has on numerous occasions talked about how this type of evidence is very dangerous. In the Comanche case, we talked about how other a defendant with a bad criminal record. And in the Watson case, which cited the Gomez decision out of the seventh circuit, it talked about how a court must articulate some propensity-free chain of reasoning if it's going to let this type of evidence in. Well, the government in this case sought to circumvent 404B altogether. Uh, the, uh, attorney who handled this case at trial actually asked whether there was any 404B evidence. And he got a reply from the prosecutor that there was none. But in fact, there was very serious 404B evidence. In, in particular, the defendant was arrested at a home of a friend three months after the conclusion of the date in the indictment. And in that home was found 18 grams of methamphetamine in a bathroom cabinet. Mr. Lund, I know that, that, uh, counsel, and it may have been you, uh, asked for a limiting instruction, but, uh, with regard to the 18.68 grams, but did counsel object, uh, to the introduction of that evidence? He did. And, uh, part of the trial certainly did object to the introduction of, of all the 404B evidence because, uh, simply the prosecutor had said that there had been none. Well, I understand that in the motion in limine and there was a request. My question is at trial, when the testimony came in with regard to the 18.68 grams, did counsel object? I, I think he had thoroughly objected to the introduction of the other crimes evidence, uh, during the course of the trial proceedings. At the time when we're talking about the 18 grams, as opposed to the additional texts, I don't know, uh, whether there was an additional objection that was made. I think Judge Bacharach put his finger on a very important question for me because I can't find where there was an objection. So would you please, if you, if you know what page in the record that you don't know. I think the most I can say is that there was, there was substantial discussion about this. The judge actually admonished the trial attorney. I wasn't the trial attorney for not bringing it up earlier, but I don't think he should have been expected to bring it up earlier because the prosecutor had told him there was no 404B evidence. Uh, the prosecutor tries to claim that this type of evidence is resgestite, but, uh, there are, there's the Kupfer case obviously to deal with, and this is simply not resgestite. It doesn't meet the seven factors that the Kupfer case deals with. It's not germane background information. Uh, it's not inextricably intertwined with the case. It's not a necessary preliminary information for the jurors to be able to understand the case. In fact, it only shows the defendants at best. It only shows the defendants propensity, uh, for subsequent drug related relationships. And that is something that's going to divert the jurors attention. The Huddleston case obviously, uh, addresses whether or not, uh, matters or substantially, uh, whether the introduction of this evidence, uh, has, uh, substantially on, uh, it substantially outweighs the potential for unfair prejudice. And also whether or not the jury was ever instructed properly. And the jury was never instructed properly in this area. Well, in, in what way was, was, uh, the jury not properly instructed because counsel, you and, uh, counsel for Mr. Hall had originally requested a limiting instruction and then specific, both you and counsel for Mr. Hall specifically told the judge that you withdrew your request for a limiting instruction. So isn't it waived with regard to an argument that the jury was improperly instructed? It, it, it could be. Uh, so, but still it doesn't, the overall tenor of this case where the prosecutor is arguing that this is just right and has put the, uh, defendant in the position that he is, uh, and allowed in this additional evidence, I think creates some serious prejudice for the defendant. Can I, and I'm sorry to, uh, why was it so prejudicial though? Because he, your defense, uh, was acknowledging that Mr. Cushing was purchasing, uh, roughly this amount, uh, twice a month from Mr. Williams. So if, uh, if say 14 grams, uh, is just for his use, the argument was that he was a heavy user and this is still just about the amount that he was acknowledging that he routinely purchased from Mr. Williams. What was this in the, in this, that context, why was this evidence so unfairly prejudicial? I think for the reasons that Comanche states, it simply, uh, over persuades the jurors to prejudge the defendant based on some new types of other crimes. And that's, I think it, it, in this instance, it actually puts drugs in his hands, whereas there hadn't been any before. The second area, the second evidentiary issue involves rule 702, which is expert testimony is permitted if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. Uh, this case involves obviously the testimony of Officer Brian Epps, who testifies, uh, very commonly for the defendant, usually at the end of most trials. And the issue is not whether Officer Epps is qualified. Clearly, this court found that Officer Epps is qualified to testify as a witness in Cristerna versus Gonzalez. But the issue is whether the district court exercised its gatekeeping function to ascertain whether Officer Epps' testimony was necessary to assist the trier of fact. And in this regard, this court, for instance, in Garcia, has found that there are instances where this type of testimony is not necessary at all. And more recently, it's in Medina Capote, which I realize is a specialized case, talked about that you may be getting opinions from experts, uh, which say Dixit of the expert. Uh, this court has noted the ruling in Mejia, uh, out of the Seventh Circuit, which finds that police officer testimony requires extra precautions. And prior to trial, the, uh, defense counsel for both parties, uh, Hall and, uh, Mr. Coochie, uh, argued that this which is an excellent, uh, treatise, really, on, on the problems that arise from this type of expert testimony. And there are three problems, essentially, that arise. One, if you have expert testimony that mirrors the testimony offered by fact witnesses. And in this instance, there was ample testimony about drug weights, uh, cumulative, uh, quantities, whether consumable quantities as opposed to distributable quantities, uh, and the meaning of various text calls that was brought out during the trial by, uh, not only Waylon Williams, but Donnie Burke and, uh, Megan Watson. So the, the court had already, the jurors had already received substantial evidence in this area. The second area that's brought out in Rodriguez is that the expert testimony should not be beyond the can of the average juror. There's not anything, particularly after the recipient witnesses, that, uh, was not something that the average juror would not have already understood. And then finally, uh, the expert must point to information outside of the case being tried. That's, uh, the, the, there are three circuit courts that have approved of this type of analysis. Uh, one from the Second Circuit, the Amuso, one from the Ninth Circuit, Rahm, and one from the First Circuit, Montes. The district court in this case made absolutely no effort to perform its gatekeeping function. Uh, in fact, it referred to it as, quote, that gatekeeping thing. Uh, it took a little more testimony only to hear, uh, when the issue was raised, uh, a little bit more about Officer Epps' credentials, but the prosecutor was never even required to disclose just what the Officer Epps' testimony would, in fact, assist the jury. Uh, and during the course of Officer Epps' testimony, of course, all of these problems arose. He decides that a large, uh, plastic bag means that the, uh, defendant, uh, must be higher up in the organization. Uh, he decides that somebody who says they want a 20 because they're down and out could only be, uh, wanting, uh, a 20 that's related to drugs as opposed to a $20 bill to try and help them get something to eat. The jurors are left with the imprimatur of officers' conclusory opinions based on this, and, uh, it conflicts with their, uh, constitutional duty to sort out the evidence themselves rather than to have Officer Epps come in at the end of every trial and sort it out for them. Finally, there's the issue of, uh, whether or not there was a prejudicial evidentiary harpoon, which is, uh, during the trial, uh, it was a bizarre line of questioning. It had to do with, uh, why, uh, my client had stopped, uh, had started dealing with, uh, Mr. Williams, and, uh, he said, uh, I don't know. He lost his source, and then, oddly, the prosecutor wants to know why he lost his source, and the answer is that, uh, he got busted and went to prison. Did counsel object? No, he didn't, so it's a plain error argument, uh, but I, I, I've been in this boat once before, as I pointed out in the McMahon case back in 1993 with, uh, Judge Cook, and the fact that somebody's been to prison, gotten busted, it completely mars the case. If it's the defendant, but, but the, but the, but the pronoun was he, and so, uh, it's, isn't it at least ambiguous in terms of whether the reference to he was the supplier or Cushing? Well, it, it, to the extent that it could go either way under the law, it should be that it has to, it's, you don't have, you don't have sufficient evidence with regard to a defendant. Uh, you, these things have to be resolved in favor of a defendant if it's ambiguous, and the government. Did the government ever refer to this in closing and opening? No. Another, so this was the only time it was mentioned, right? Yeah, but it is the type of language that perks up a juror's ears to think that, that he is my client and he could have already been busted and gone to prison. Beyond that, we think that either singly or cumulatively under the Anaya analysis that, uh, these three errors, prejudice, beyond that is just the conspiracy case itself. Uh, this is a case where the government's own recipient witnesses basically, uh, define what consumption amounts were as opposed to distribution. And you have Waylon Williams testimony that, uh, he used, uh, four ounces a month. And my client was getting only two ounces at most a month, which would put him in the consumption amount. You have other witnesses, including even Officer Morrison, testify that there was nothing sinister about those text messages. And you have ample testimony from Williams and others as to what those text messages meant. You have a situation here where a defendant is, uh, has, that Williams testifies that there's no knowledge that the defendant distributed anything, but Williams was well-connected in this little small town, uh, so he should have known if there was some kind of distribution. You have, uh, the fact that the defendant was admittedly an addict and that, uh, he, he needed large quantities of methamphetamine to feed his, his addiction. You have no participation in Williams' organization whatsoever. He never delivered drugs. He never collected money. He never filled in when Williams was gone. Uh, he never pooled his resources with any of the other co-defendants. In fact, uh, he never met with any of the other co-defendants in this case. Uh, and in fact, during the trial, it was admitted that this was nothing more than a buyer-seller relationship. I'd like to reserve the remainder of my time, please. Thank you, counsel. Let's hear from the government. Ms. Epperle. Hey, please, the court. I'm Linda Epperle. I represent the United States in this case. Um, we obviously have four matters that are agreed to as issues by these defendants and then the sole issue that's raised by Mr. Cushing about the evidentiary heart, heart pain. I would like to call the court's attention first because I don't want to run out of time to do so to a case that was published after the primary briefs were filed in this case. And I apologize for not providing it sooner because I didn't discover it until I was preparing for this oral argument. Uh, the case is United States versus Mere Garces. It's at 967 Fed Third 1003. It was issued on July 28th, 19, I'm sorry, 2020, uh, an opinion by, uh, Judge Holmes. The case, although it arises in a double jeopardy context with a Mexican border gatekeeper who was charged with conspiracies in Colorado and Texas, the case discusses quite a bit about conspiracies interdependence, what this court will look to, whether in determining if there's one conspiracy or two, the court will look at, uh, whether or not there's, uh, a shared objective. If we're going to use only the, uh, which tests we're going to use and understanding that when you're looking whether or not there's a variance, uh, that you're also allowed to look at the time, the commonality of time, place, and activities. Uh, and, and there's just language there that I think is important for this court to consider in issuing an opinion in this case. And I really won't go beyond that unless the court has questions because it's not a case that was briefed, but it is something that's published law in this circuit, very recent published law that the court should be aware of. Uh, in this case, there was, the jury found, a commonality and a conspiracy in which both of these defendants along with 10 others participated. The objective of that conspiracy, as indicated in the superseding indictment in volume one of the record at page 65, indicates that for four years from 2014 to 2018 in Oklahoma, there was a conspiracy to knowingly and intentionally distribute and possess in excess of 500 grams of a mixture of substance containing methamphetamine. The manner and the means listed in that indictment indicate the kind of activities that were undertaken. Uh, there was an intent, an agreement to possess and distribute, to possess, intent to distribute methamphetamine, that the parties would use cell phones to communicate with each other through phone calls and texts, that they would use automobiles to travel, whether to Oklahoma city to pick up items from a source or to travel to each other's homes in that rural area near Stilwell, uh, to deliver. Yes. A couple of times that there was a conspiracy to both distribute and possess with intent to distribute. One of the special interrogatories in Mr. Hall's jury specifically answered that there was a conspiracy to distribute, but did not check the box for a conspiracy with possession with intent to distribute. What do you make of that finding? And is that, uh, but, but, but the jury for Mr. Lund's client, Mr. Cushing did check both boxes. Doesn't that suggest that there was a, that, that the 18.68 grams that was found in Mr. Cushing's friend's, uh, house was, uh, pretty damning because that is probably the only explanation for the difference in the special interrogatories, the two defendants cases. Your Honor, I certainly understand the question. Um, I don't think that that's the only way to the testimony at trial indicated that on the one hand, you had what I consider the three amigos, Hall, Wayne Williams, and Jesse Catron, who had known each other for years since childhood, were great friends. Mr. Lund's client, uh, Mr. Cushing was brought in later on. Uh, Mr. Cushing was brought in. I think it's reasonable to conclude from the evidence because he had a house that was on a highway that had a lot of traffic that clearly he had a customer base and could assist the, the organization in that way. There was a lot of, a lot more testimony about Mr. Cushing having a lot of people coming and going from his home, folks who would hang out over there, uh, use methamphetamine. Mr. Hall tended to be much more circumspect, kind of like, uh, Mr. Williamson in being very careful about who he had over to the, obviously it didn't all work out for him in the end, but he was certainly more careful. And you got the impression from the testimony that Mr. Cushing's house, uh, was more of a place that a lot of people could identify as a drug hangout, a place to go, a place to buy. Um, that may explain the difference in the to, you know, a closer group of friends. The, uh, both defendants were indicted for certain overt acts as far as receiving methamphetamine and distributing that to others. Here, there are a number of items that were similar in how they treated this conspiracy, that they communicated by calls and texts, that there was a code that they utilized as far as Wayne Williams, if his gate was open, it meant come in. They all understood that sometimes on the phone, he might say that he wasn't there, but, but you could still come by because he probably was. There was a lot of secrecy. Uh, they tended to keep this a very tight group. Uh, there was transportation and driving to and from the various homes for drugs or for money on the parts of these defendants. Um, Hall, as we have alleged, did provide information, uh, regarding law enforcement and snitches. And there was certainly evidence where the jury could determine that he provided an enforcement function for this organization. Mr. Williams, he said that or testified that he didn't know whether Cushing and Hall were distributing or not. And, um, I'm not, I'm not sure I, I saw a lot of evidence that would show Mr. Hall distributed to anybody. Um, could you just kind of lay out what you think the best, you know, piece of evidence is for both Cushing and Hall? Yes. Uh, we certainly, as to Mr. Hall, we, we can look to the amount that he's using. We can look to the testimony of at least two women who went to his house, uh, and they knew they were going there to get methamphetamine. And one of those witnesses who indicated that at least once she left there with, uh, with methamphetamine that she took with her. Now, there was an argument made here today that perhaps that was because, you know, she could have stolen that. It's, it's much more likely that she left with that amount, uh, because she was being provided that amount by Mr. Hall. If I give drugs to a friend, you know, a social friend, is that distribution? It depends upon what he's receiving in return. If they're just sharing the drugs, maybe not. Although there's certainly a case law that indicates that you don't necessarily have to sell for profit in order to be part of a conspiracy. Is there evidence of a quid pro quo? The, there was a witness who testified that she provided all kinds of services for Mr. Hall. She babysat his kids. She helped him harvest hay. She did a number of things and she said at trial, I didn't get paid for any of that. But I believe that it's certainly reasonable for a jury to assume that part of the reason all of that was being done was because he was a source of methamphetamine for her. The defendants would like to point out or would like to indicate that Mr. Hall was just a big user and he was using all this meth that he got over these years from Wayne Williams. But Mr. Williams testified, while he may have said I'd never do him to be a drug dealer, Mr. Williams also said he would not agree with defense questions that Mr. Hall was a out of control or major drug user. He said, in fact, he was way more worried about his friend Mr. Hall's drinking than he was his drug use. Well, if that's true. Ms. Zeppelin, can I just follow up on Chief's questions with regard to a quid pro quo? You referred to the person who was giving the services, Julia Guthy. Now, so Julia Guthy specifically said, yeah, I did it because he was my friend. So when you say that the jury could disbelieve that, well, the jury could do anything they want, I suppose, but there is no evidence to support that it was a quid pro quo. The only testimony that was given was directly contrary to a quid pro quo, right, for Julia Guthy. And the second part of my question was with Megan Watkins, because you were referring to the person who left with a half a gram, which was Megan Watkins. And there was no testimony that Megan Watkins had given any consideration, had paid for it or anything like that, correct? That is correct as to Megan, that she left with it, but she did not indicate things that she did in return. However, I'd also call the court's attention to the fact that it is not unusual for people who are distributing to offer and sometimes share illicit substances with others, with their potential or existing customers, whether it's as, you know, a taste to get them interested or as a reward perhaps for something they've done. We know that in this case, one of these individuals could tell you that she was sure it was Wayne Williams dope because when she got dope at Hall's house, it always tasted oily, like Wayne Williams methamphetamine did. So there's not a requirement that there has to be a show of an exchange for cash in order for this, for him to be distributing. He also is the defendant who is potentially providing law enforcement information. Well, you said that before, what, so what evidence was there, you know, I had asked Ms. Spiller about the, you know, the call about Jessica and she pointed out that that was really Williams who was initiating that. And with regard to the call about Haley, you know, he presumably was talking about when he said the pronoun he, the complaint was that Haley had snitched on he Hall, not on Williams. So what evidence is there of Hall supplying counter intelligence for Williams? Well, he's talking about, first of all, as the court previously mentioned, he did indicate on one occasion that the road was too hot for them to be on. These are, this is a rural area in Adair County. These are ranchers who are able to watch out for one another and that's what they're doing. The, even if, even if the defendant is remembering correctly that Mr. Hall was the first one to mention this woman's name, they did discuss the possibility of whether or not someone was talking with DEA and whether it's people surrounding someone's house or gathering up near the church building or any of the other texts that took place, they would be concerned whether a young woman is snitching only on Mr. Hall or whether she's snitching on the entire drug conspiracy because any attention by law enforcement to Chris Hall puts the conspiracy in danger. The testimony at trial was that, that that Mr. Williams talked with Mr. Hall about Megan Watkins being in jail and being interviewed by the DEA. That's at page 693 of the record. But more importantly, he, Mr. Wallace was, I mean, Mr. Wayne Watkins was asked by the prosecutor, if someone were talking to the DEA about you, would that concern people in your customer base? And he said it should. The officer, the prosecutor said, why is that? And he said, because trouble is coming because we are in the meth business. And that's at page 694. He didn't say I have a meth business I need to protect. He said we're in the meth business. And while Wayne Williams may have attempted to protect his friend, Mr. Hall, to the extent he could during this trial by, to some degree, minimizing whether or not Hall was a drug dealer. You know, Wayne, your major conspirator, Mr. Williams, by this point had already confessed. He had pled guilty. He's testifying on behalf of the government. But that doesn't mean he has to go out of his way to hang his friend Hall if there's any way that he can assist him. And I believe that that's what happened here. On all of them. Counsel, in your argument on the sufficiency of the evidence, in your review of the record, how do you view the evidence as compared to Cushing and to Hall, which you think is stronger? That's a difficult question because it's different evidence. Because they play different roles in the conspiracy. The evidence as to Cushing is much stronger as far as him being a distributor. Because that's what his role is. He's brought into this because he's got a lot of customers. Mr. Hall distributes to a degree. We admit we only have a couple of witnesses who talk about Mr. Hall distributing, sharing, giving someone a little bit to walk away with. But Mr. Hall was in this from the beginning. And Mr. Hall helps keep an eye on who's going up and down the road in Adair County. Keeps an eye on who may or may not be talking. And no matter which of those defendants mention a name first, they're both having the conversation about whether or not some of these women are snitching them out. So they play different roles. And the different roles that they play are all important to the continued success of this conspiracy, which shows the number one thing that the defendants argue is missing, that the defendants argue is missing in this case, and that is interdependence. They all perform roles. And even in this very small conspiracy, those roles interconnect. And it's important because the success of each one of them depends upon the success of the others. Without the customer base provided by Cushing, who was Wayne Williams' second largest customer, without that customer base, your major conspirator may not have been able to pay his debt in Oklahoma City, and the source may have dried up. Without the sort of intelligence offered by Mr. Hall, law enforcement could have found out about this. Somebody could have driven down the road that was too hot and created all kinds of problems for the other conspirators. Counsel, share with me what is your best evidence that you see in this case pointing to Mr. Hall being a part of this conspiracy? The best evidence that we have with Mr. Hall is the testimony of the two women who used meth at his house, but most particularly the one who left with some, and the five calls and five text messages that went back and forth with Mr. Hall, indicating discussions about law enforcement, who's snitching, whether the roads are hot, whether or not one or the other of them may be under surveillance. There's equally compelling evidence against Mr. Cushing, and I'd like to move for just a moment to the matter that's in Mr. Cushing's brief but not shared by Mr. Hall, and that was the evidentiary harpoon. We would agree with Judge Bacharach's questioning of whether or not this error was preserved. We do not believe that it was. I'm sorry. We definitely believe that the evidentiary harpoon, supposed, was not preserved, but as to the 404B evidence, we do not believe that that argument was necessarily preserved either. There was not an objection made at the bench. They simply agreed to ask for limiting instruction, and then they did not do that. Well, that was with regard to the 18.68 grams, but there was an objection, was there not, to the to the March text messages involving defendant Cushing on 404B grounds, correct? So they did preserve that part of the 404B argument, right? I believe that is correct. Well, why wasn't that erroneous? The alleged conspiracy in the indictment had terminated in January of the 28th. These are in March. So why wasn't this just classic improper 404B evidence of other crimes, other misconduct? Mainly because the reason that he was not arrested until a later date is because he fled. But what did his sales of, or distribution of methamphetamine implied in the text, what did that have to do with consciousness of guilt or flight? The text messages indicating later sales indicate, is indication that he was continuing that he had had these people to distribute to before and that he was continuing to do that. It supported the argument as to what he was doing during the time of the conspiracy. It also, those texts also corresponded with information that was occurring beforehand in similar texts. I don't know what that, I don't know what that means. Sorry, Your Honor. Well, in other words, so you gave two answers and let me ask you this, aren't both of those answers completely contrary to what Judge White, his explanation, because he allowed it, not because it was evidence of consciousness of guilt or for some other proper 404B, but because it was res gesti. And you haven't so far defended that rationale. So if that was his reason, did he not abuse his discretion, even if he could have, even if we credit your two theories, even if he could have adopted those, he didn't do that. So what is it about res gesti that fell within his discretion? The trial court, after much consideration of this issue, did find that the material was res gesti. We would argue that that is similar to finding that it was intrinsically connected. The secrecy was important, at least in those as to Mr. Hall. Excuse me, Your Honor. That we would argue that the court made the proper considerations in looking at 404B evidence and the court should rely on what the trial court said as opposed to my abilities to recall off the top of my head what went on with Mr. Cushing. Not the best answer I've ever given, but that's what I'll stand on. Yes, Your Honor. We appreciate your stipulation. I appreciate it. We would urge the court in looking at this case to consider the standard of review for sufficiency of the evidence, to consider the knowledge that we believe was shown as far as the shared objective, the interdependence among the co-conspirators. We do not believe that this is a case where there was any kind of fatal variance. We believe that the instructions on the conspiracy were sufficient, that the instructions talked about a single conspiracy, the conspiracy, and that they were adequate under the law to cover this consideration. We also would urge the court to find that the other crimes evidence that was admitted was properly admitted, that even if there had been any error it was harmless, and then finally we would urge that there certainly hasn't been any plain error shown as to... Have you argued harmlessness? I didn't see a harmlessness argument in either brief with regard to Cushing or Hall, so we'd have to do that sui sponte, right? I believe that's correct. I did not see a harmless argument in our brief. We would certainly argue that it's not error under any circumstance, and the single question as to Mr. Cushing as far as where he lost his source, we would urge this court to consider what's already been pointed out, that that was not referred to in closing argument, it was never mentioned again, it was one question in the course of a long trial, but to read that as something where a jury would understand Mr. Cushing to be saying, I went to prison, just doesn't make sense given the language that was and in fact there's just no way that that could have influenced the verdict to the point that it would be plain error. Given all of that, we would urge the court to affirm, we would urge the court that there has not been any error shown, so there's certainly not cumulative error, and we would ask this court to uphold both convictions. Thank you. Thank you, counsel. Ms. Miller has some rebuttal time. Yes, your honor, thank you. I believe I have a little over two minutes, so I'm going to try not to talk too fast, but I have several things I would like to address. Starting with, I'd like to point the court to Appellant's Appendix Volume 5, page 694, because the government has referenced both an argument and its brief, a section talking about why Mr. Williams would be concerned if Megan Watkins is talking about him. We objected to that testimony as it related to Mr. Hull, and the objection was sustained, and so I do not think that portion of the record assists the government in terms of its case against Mr. Hull in grouping him in with Waylon Williams. I want to make a argument in general is, this was an overarching conspiracy. Everybody was acting together. Everybody had their role, but that runs afoul of the rich language in Codiacus that warns courts that there are dangers in these large conspiracy cases of transference of guilt, and that's exactly when the government argues everybody was involved. We can talk generally about this conspiracy. It comes very close to transferring guilt from one co-conspirator to the other, and the government answered the question about what the strongest case is against Mr. Hull in terms of sufficiency of the evidence to show he was part of the overarching conspiracy, and we've never challenged that Mr. Hull was regularly purchasing methamphetamine from Mr. Williams. They clearly had that relationship, and they were clearly concerned about protecting that illegal relationship. They were also friends. They'd been friends for 25 years, but the government points to the one time that Julie Guffey and Megan Watkins are at his house and pass the pipe and suggest that he was circumspect, so while that is the only incident of distribution they actually have evidence of, but there were over 6,200 communications seized in this case. Of the six, none of them proved that. It's more akin to friends sharing methamphetamine socially. I see I'm out of time, so I will quickly wrap up. We would ask the court to reverse and remand this case to the district court with instructions to trial or grant any other remedy the court deems necessary in the interest of justice. Thank you very much. Thank you, counsel, and Mr. Lund had a half a minute or so. You may proceed, Mr. Lund. Thank you. The argument was made that Cushing was brought into this conspiracy because he had a lot of customers. You'll recall that Waylon Williams testified that he didn't know that my client, Mr. Cushing, had any customers at all. The statement was made in argument that there were texts between the co-conspirators. It's noteworthy that there were no texts between Mr. Cushing and any of the other co-conspirators, and in fact six weeks passed after the telephone call. And finally, it was not legal to have people over at his house. There was never any evidence of a quid pro quo that came to his house. Thank you, counsel. Your time has expired. Counsel will be dismissed and be submitted.